IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| INSTANT TECHNOLOGY, LLC, an Illinois, limited liability company, | ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | No. 12 C 491 |
| ELIZABETH DEFAZIO, LAURA REHN, MEGAN MARKER, BETHANY MEEK, ERIN BAUER, JOEL KATZ, ANDREA KATZ individuals, and CONNECT SEARCH LLC, a Delaware Limited Liability Company | ) ) ) ) ) ) | |
| Defendants. | ) ) | |

## MEMORANDUM OPINION AND ORDER CONTAINING COURT'S FINDINGS OF FACT AND CONCLUSIONS OF LAW

JAMES F. HOLDERMAN, District Judge:

Plaintiff Instant Technology, LLC ("Instant"), a company in the information technology ("IT") staffing industry, sued five of its former employees, Ms. Elizabeth DeFazio ("DeFazio"), Ms. Laura Rehn ("Rehn"), Ms. Megan Marker ("Marker"), Ms. Bethany Meek ("Meek"), and Ms. Erin Bauer ("Bauer") (collectively "Employee Defendants"), as well as two non-employees, Mr. Joel Katz ("Joel Katz") and Ms. Andrea Katz ("Andrea Katz"), and one of Instant's competitors, Connect Search, LLC ("Connect") (collectively "Connect Defendants") (altogether "Defendants"). Instant sought in its First Amended Verified Complaint ("Amended Complaint") (Dkt. No. 40 ("Am. Compl.")) injunctive and other relief from the Employee Defendants for what Instant alleged to be breach of employment agreements, breach of fiduciary duty, and alleged violations of the Computer Fraud and Abuse Act ("CFAA"), 18 U.S.C. § 1030. Instant also sought injunctive and other relief from all Defendants for what Instant alleged to be

violations of the Illinois Trade Secrets Act ("ITSA"), 765 ILCS 1065/2-3, tortious interference with business expectancies, and civil conspiracy, and from DeFazio and the Connect Defendants for what Instant alleged to be tortious interference with contract.

In April 2014, the court conducted a bench trial at which Instant withdrew its requests for injunctive relief. The parties presented evidence regarding Instant's other claims, as well as DeFazio's counterclaim against Instant for what DeFazio alleged were unpaid portions of her 2011 bonus. At the trial, Instant presented the testimony of twelve witnesses. Ms. Ronna Borre ("Borre"), Instant's President and CEO, testified about Instant's business and revenue, the IT staffing industry, and the Defendants' alleged conduct. Mr. Alfredo Aoun ("Aoun"), DeFazio's partner, testified about his computerized backup of DeFazio's email. The five Employee Defendants each testified about Instant's business, the IT staffing industry, their employment at Instant, and the formation of Connect. Joel Katz and Andrea Katz each testified about the IT staffing industry and the formation of Connect. Ms. Rebecca Rouhoff ("Rouhoff"), an Instant administrative employee, testified about her observations after the departure of the Employee Defendants. Mr. Wolfe Wilke ("Wilke"), Director of Operations-Forensic Services at the Barrington, Illinois office of CyberControls, LLC, testified about his examination of the Employee Defendants' computers after their termination or resignation from Instant. Mr. Anthony Raimonde ("Raimonde"), a former accountant at Instant, testified regarding Instant's purported losses as a result of Defendants' conduct.[1] Instant also offered certain parts of the

---

[1] Instant withdrew Raimonde as a witness at the trial before he could complete his testimony about the projected losses Instant alleged were attributable to Defendants' conduct.

deposition testimony of Ms. Christina Peterson. (PTX 328.) Instant did not present the testimony of its previously disclosed damages expert, Dr. Dwight Stewart. Defendants presented the testimony of six witnesses, including the five Employee Defendants and Joel Katz.

After considering all of the evidence presented at the April 2014 trial, the court finds the Employee Defendants did not breach their Employment Agreements with Instant (Count I) or their fiduciary duties to Instant (Count IV). The court further finds that none of the Defendants violated the Illinois Trade Secrets Act (Count II) or the Computer Fraud and Abuse Act (Count V), nor did any of the Defendants commit any common law torts (Counts III and VI) or participate in a civil conspiracy (Count VII). Finally, the court finds that DeFazio did not prove her counterclaim seeking money damages. This Memorandum Opinion and Order, as outlined below, constitutes the court's findings of fact and conclusions of law.

I.    Stipulations of Uncontested Facts

   A.  The Parties
   B.  Instant's History and Business
   C.  Employee Defendants' Employment at Instant and Employment Agreements
   D.  Events of October 2011 through December 2011
   E.  Events of January 2012
   F.  Connect Search Solicitations and Placements

II.   Further Factual Findings

   A.  Instant's Business
   B.  Instant's Workforce
   C.  Instant's Business Data
   D.  Instant's Candidate Hotlist
   E.  Instant's Candidate Roll-Off List

F.  Instant's Employees' Data Practices

G.  Events of 2011 and 2012

H.  Instant's Investigation after Employee Defendants' Terminations and Resignations

I.  Startup of Connect

III.  Applications of Fact and Conclusions of Law

A.  Employee Defendants' Alleged Breach of Employment Agreements (Count I)

i.  Inadequate Consideration for Restrictive Covenants

ii.  Non-Solicitation Covenants in Employee Defendants' Agreements with Instant

a.  Non-Solicitation of Instant's Candidates

b.  Non-Solicitation of Instant's Clients

c.  Instant's Purported Confidential Information

iii.  Non-Recruitment Covenants in Employee Defendants' Agreements with Instant

iv.  Non-Disclosure Covenants in Employee Defendants' Agreements with Instant

B.  Defendants' Alleged Violation of Illinois Trade Secrets Act (Count II)

C.  DeFazio's and Connect Defendants' Alleged Tortious Interference with Contract (Count III)

D.  Employee Defendants' Alleged Breach of Fiduciary Duty (Count IV)

E.  Employee Defendants' Alleged Violation of the Computer Fraud and Abuse Act (Count V)

F.  Defendants' Alleged Tortious Interference with Business Expectancies (Count VI)

G.  Defendants' Alleged Civil Conspiracy (Count VII)

H.  DeFazio's Counterclaim for Alleged Breach of Agreement and Violation of Illinois Wage Payment and Collection Act

IV.  Conclusion

## I.  Stipulations of Uncontested Facts

Before the trial commenced, consistent with the high level of professionalism displayed by the counsel of record throughout pendency of this litigation and with the court's appreciation, the parties agreed to stipulations regarding numerous facts which this court adopts as

uncontested. The stipulated facts as set forth in the parties' final pretrial order (Dkt. No. 266-1) are as follows:

## A. The Parties

1.      Connect Search is a Chicago-based staffing firm that specializes, in part, in the recruitment and placement of IT professionals.

2.      DeFazio, Rehn, Marker, Meek and Bauer are all former employees of Instant.

3.      DeFazio, Marker, Meek and Bauer currently work for Connect Search. Rehn formerly worked for Connect Search.

4.      DeFazio is the President and Co-Founder of Connect Search. She is also a member of the Board of Managers of Connect Search.

5.      DeFazio owns approximately 15% of Connect Search.

6.      During her employment at Connect Search, Rehn was a Vice President of Sales.

7.      Marker is a Vice President of Sales at Connect Search. She is also an owner of Connect Search.

8.      Meek is a Vice President of Recruiting at Connect Search.

9.      Bauer is a Vice President of Recruiting at Connect Search.

10.     Defendant Joel Katz has worked in the staffing business for more than 20 years.

11.     Joel Katz is the former President and CEO of Addison Search, a professional staffing company he founded in 1999. Joel Katz was an owner of Addison Search until 2011.

12.     Joel Katz is a member of the Board of Managers of Connect Search.

13.     Joel Katz is the Chief Investment Officer of a company called Brown Lab Investments, LLC ("Brown Lab").

14.     Brown Lab is the majority owner of Connect Search.

15.     Defendant Andrea Katz is married to Joel Katz.

16.     Andrea Katz has worked in the staffing business for more than 20 years.

17.     Andrea Katz co-founded Addison Search with Joel Katz. She was employed by Addison

Search until early 2010 and was an owner of Addison Search until 2011.

18.    Andrea Katz is a member of the Board of Managers of Connect Search.

19.    Andrea Katz is the majority owner of Brown Lab and currently serves as Brown Lab's Chief Executive Officer. Andrea Katz organized Brown Lab in 2011 as an investment vehicle.

20.    Prior to forming Connect Search, Joel Katz and Andrea Katz had worked with DeFazio.

21.    Bauer formerly worked for Addison Search.

## B. Instant's History and Business

22.    Instant was formed in 2001 by its President and CEO, Borre.

23.    Borre left a position at a global staffing company to launch Instant.

24.    Instant is wholly-owned by Borre.

25.    As part of its business, Instant helps companies locate IT professionals needed to fill temporary, permanent and/or temporary-to-permanent positions.

## C. Employee Defendants' Employment at Instant and Employment Agreements

26.    DeFazio worked for Instant from 2003 until January 3, 2012.

27.    DeFazio's most recent title at Instant was Executive Vice President, Sales & Operations.

28.    DeFazio reported directly to Borre.

29.    DeFazio received over $300,000 in base salary, bonus and commissions in 2010, and more than $222,000 in total compensation in 2011.

30.    Rehn began working for Instant on or about June 17, 2010. She held the position of Senior Account Manager, and was responsible for, among other duties, maintaining and increasing sales of Instant's services and developing new clients and accounts.

31.    Marker began working for Instant on or about March 24, 2010. She held the position of Senior Account Manager, and was responsible for, among other duties, maintaining and increasing sales of Instant's services and developing new clients and accounts.

32.    Meek began working for Instant on or about January 7, 2008. She held the position of Lead/Senior Recruiter, and was responsible for, among other duties, identifying and vetting placement candidates' skills and qualifications, submitting candidates' profiles to

the company's account managers, and helping to facilitate the placement of the candidates with clients.[2]

33.     Meek also conducted training workshops and wrote Instant's training manual.

34.     Bauer worked at Instant from 2005 to 2008. She later returned to Instant in March of 2011. Bauer held the position of Recruiter, and was responsible for, among other duties, identifying and vetting placement candidates' skills and qualifications, submitting candidates' profiles to the company's account managers, and helping to facilitate the placement of the candidates with clients.

35.     Instant divides its employees between sales (client side) and recruiters (candidate side). Meek and Bauer were on the candidate side, and were responsible for sourcing candidates to fill open positions at clients. Marker and Rehn were on the client side, and were responsible for generating sales and facilitating placements of candidates at clients. At the time of her termination, DeFazio was in a sales role on the client side of the business.

36.     DeFazio, Rehn, Marker, Meek and Bauer signed employment agreements with Instant (collectively, the "Employment Agreements" or singularly, the "Employment Agreement").

37.     Among other things, the Employment Agreements contained a "Covenant Not to Solicit Instant's Clients or Employees," which states, in relevant part:

> Employee shall not directly or indirectly, for a period of two years after termination of Employee's employment with Instant, perform IT Staffing Services for or accept IT Staffing Services business from, or assist any person, firm, partnership, corporation or other entity to perform IT Staffing Services for or accept IT Staffing Services from, any of [Instant's Serviced Clients]. In furtherance of the foregoing, Employee agrees that ... (a) Employee shall not contact or solicit any of Instant's Serviced Clients for a period of two years from termination of Employee's employment with Instant ... (b) Employee shall not notify any of Instant's Serviced Clients of the termination of Employee's employment with Instant ... (c) Employee shall not notify any of Instant's Serviced Clients where Employee is employed at any time during said period of two (2) years from termination of Employee's employment with Instant ...

(Employment Agreements at § 8 (referred hereafter as "Non-Solicitation Covenants").)

---

[2]     Consistent with the IT industry terminology, the court in this opinion refers to IT job seekers as "candidates" and companies seeking to fill IT positions as "clients."

38.    The "Covenant Not to Solicit Instant's Clients or Employees" further provides:

>     Employee agrees that during and after termination of Employee's employment
>     with Instant, she will not directly or indirectly encourage, solicit, or otherwise
>     attempt to persuade any employee or consultant of Instant to leave the employ
>     of Instant, to breach any employment or consulting agreement with Instant, or
>     to violate any procedure or policy of Instant.

>     (Employment Agreements at §8(e) (referred hereafter as "Non-Recruitment
>     Covenants").)


39.    "Instant's Serviced Clients" are defined in the Employment Agreements as "any of
       Instant's Clients who have been serviced by Instant within three (3) years prior to the
       termination of Employee's employment with Instant . . . ." (Employment Agreements at §
       8.)

40.    The Employment Agreements also contained a clause regarding the nondisclosure of
       Instant's proprietary property which states, in relevant part:

>     The Employee covenants and agrees that she/he shall not, while in the employ
>     of Instant, or thereafter, communicate or divulge to, or use for the benefit of
>     himself/herself or any other person, firm, association or corporation, without
>     the prior written consent of Instant, and information in any way relating to the
>     Proprietary Property. The Proprietary Property shall remain the sole property
>     of Instant or Instant's Clients, as the case may be and upon termination of
>     his/her employment with Instant, the Employee shall thereupon return all
>     Proprietary Property in his/her possession or control to Instant.

>     (Employment Agreements at § 7(b) (referred hereafter as "Non-Disclosure Covenants").)

41.    "Proprietary Property" is defined in the Employment Agreements as:

>     information regarding the business, procedures, activities and services of
>     Instant or Instant's Clients, including but not limited to, memoranda; files;
>     programs; clients account and customer lists; information about and notes
>     regarding customers, candidates and consultants and their reserves (placed,
>     active and inactive); costs and prices of Instant; client needs, requirements and
>     business affairs; records; manuals; computer data and reports ...

>     (Employment Agreements at § 7(a).)

42.     DeFazio had a written compensation plan for 2011, pursuant to which DeFazio was entitled to a performance bonus if Instant achieved certain revenue and net income goals.

43.     Instant paid DeFazio $10,000 in bonus compensation for 2011.

### D. Events of October 2011 through December 2011

44.     On October 26, 2011, Andrea Katz contacted DeFazio via LinkedIn. Andrea Katz and DeFazio then had lunch on November 3, 2011.

45.     In November 2011, DeFazio had lunch with Joel Katz. At that lunch, Joel Katz told DeFazio that he was considering starting a new staffing company. He also asked DeFazio if she would consider leaving Instant.

46.     Later that month, DeFazio met Joel Katz for breakfast. At that breakfast, Joel Katz told DeFazio that she could be a candidate to run his new staffing venture.

47.     On December 9, 2011, Instant hosted its annual holiday party. Meek came to Chicago from St. Louis for the party and rented a hotel room. DeFazio met Meek at her hotel room before the party to talk.

48.     On December 12, 2011, John Kinsella, the Senior Vice President of real estate company Grubb & Ellis, sent Joel Katz a preliminary market survey showing available office space in Chicago.

49.     On December 13, 2011, DeFazio and Joel Katz exchanged emails regarding their itinerary for viewing available office space in Chicago.

50.     On December 14, 2011, DeFazio and Joel Katz toured available office space in Chicago, including an office at 10 South LaSalle Street.

51.     On December 15, 2011, DeFazio signed a revenue goal sheet saying she would attempt to generate $2.5 million in revenue at Instant in 2012.

52.     Also on December 15, 2011, Meek spoke with Andrea Katz over the telephone. Following their conversation, Meek sent Andrea Katz a thank you email saying: "I'm thrilled to be a part of this new chapter." In her email, Meek also mentioned the possibility of meeting with Andrea and Joel Katz in Chicago on December 29, 2011.

53.     On December 16, 2011, DeFazio sent Joel Katz an email saying: "I wanted to reach out and let you know that I am super excited and am so 'in' with our plan and partnership."

54.     On December 29, 2011, DeFazio sent Joel Katz an email saying: "i hope we can also get the ladies on board w us, so i do not have to leave them behind."

55. Also on December 29, 2011, Marker sent Joel Katz an introductory email saying:

> "Hi Joel, My name is Megan Marker and I am Account Manager [sic] at Instant. I was referred to you by one of my connections on LinkedIn and heard you were looking to open a staffing service in the Chicagoland area. I am interested to hear more about this."

56. On December 30, 2011, Rehn sent DeFazio an email saying: "Call [me] after you talk to Joel."

### E. Events of January 2012

57. On January 3, 2012, Borre terminated DeFazio's employment with Instant at a restaurant, without notice, and DeFazio never returned to Instant's office.

58. Connect Search was formed on January 4, 2012, but did not begin operating until February 27, 2012.

59. On January 5, 2012, Marker resigned her employment with Instant via telephone.

60. On January 6, 2012, Meek similarly resigned her employment with Instant via telephone.

61. On or around January 9, 2012, DeFazio, Rehn, Marker, Meek and Bauer all signed employment agreements with Connect Search.

62. On January 10, 2012, Instant, through its counsel, sent separate cease and desist letters to DeFazio, Rehn, Marker, Meek, and Bauer.

63. The cease and desist letters expressed Instant's concerns about certain of Defendants' pre- and post-employment activities and warned that if the parties were not able to resolve the matter in an amicable fashion by January 17, 2012, Instant would file suit.

64. On January 17, 2012, Instant, through its counsel, sent a cease and desist letter to Joel Katz.

### F. Connect Search Solicitations and Placements

65. In 2012, Connect Search placed multiple candidates at The University of Chicago.

66. One such candidate was Olumide Kehinde.

67. Instant had placed Mr. Kehinde at its client Accenture in 2010. Certain of the Defendants were aware of this placement.

68. In 2012, while Mr. Kehinde was still working at Accenture, Connect Search set up an

interview for him at the University of Chicago.

69.     Connect Search successfully placed Mr. Kehinde as a Windows System Administrator at the University of Chicago on May 22, 2012. Defendants Meek and Rehn worked on this placement.

70.     Connect Search placed Brandon Rowe at the University of Chicago effective September 4, 2012. Rehn and Meek worked on this placement.

71.     Connect Search placed Chris Sersic at the University of Chicago effective October 15, 2012. Rehn and Meek worked on this placement.

72.     Connect Search placed Daniel Weiske (through his company IT Federal Services) at the University of Chicago effective July 9, 2012. Rehn and Meek worked on this placement.

73.     Connect Search placed George Moraetes (through his company Securityminders, Inc.) at the University of Chicago effective June 11, 2012.

74.     Connect Search placed Jareth Nicasio at the University of Chicago effective July 23, 2012. Rehn and Meek worked on this placement.

75.     Connect Search placed Stephen Adams at the University of Chicago effective October 8, 2012. Rehn and [non-defendant Laura] Cation worked on this placement.

76.     In 2012, Connect Search placed at least one candidate at Orbitz. [Non-Defendant] Christina Peterson worked on this placement.

77.     Bauer began soliciting business from Orbitz on behalf of Connect Search in the summer of 2012.

78.     On July 11, 2012, Connect Search executed a Master Services Agreement with Orbitz.

79.     Around that time, Connect Search employees began submitting candidates for an open Windows Engineer position at Orbitz. Connect Search successfully placed a candidate, Jeffrey Snyder, in the Windows Engineer position on November 26, 2012.

80.     On August 1, 2012, Rehn emailed Anixter's Corporate IT Supervisor, Razz Cura, and submitted two candidates for an open "QA" role. Based on this submission, Anixter agreed to conduct a phone interview with one of the candidates, James Budilovsky.

81.     Marker submitted candidates to Augmentity on behalf of Connect Search.

82.     Marker worked on the Banker's Life account at Instant. On April 18, 2012, while employed at Connect Search, Marker sent an email to Jim Gucciard at Banker's Life

recommending an "all-star" candidate, Kurt Weissgerber.

83.    In July and August of 2012, Bauer sourced candidates for a Security Log Management Engineer position at Blue Cross-HCSC.

84.    Marker placed candidates at Brightstar while employed at Instant. On June 27, 2012, while employed at Connect Search, Marker emailed Sapna Rao at Brightstar and submitted two potential candidates for an open position there. In response, Ms. Rao asked Marker to set up a phone interview with one of the candidates, Avinash Athelli.

85.    In March and April of 2012, Rehn reached out to Tamara Brown at Chamberlain and submitted a candidate for an open QA Testing Manager position there.

86.    On August 16, 2012, Marker emailed Mark Francetic at CME and asked him to consider a candidate named Anish Jacob for a C++ Developer position.

87.    In April and May of 2012, Meek submitted candidates for an Oracle R12 Implementation Lead position at Hyatt.

88.    Meek and DeFazio both worked on the Law Bulletin account at Instant. In April of 2012, Meek and DeFazio sourced candidates for an open Java Developer position at Law Bulletin on behalf of Connect Search.

89.    In May of 2012, Marker contacted Sue Hardek at Manifest and asked her to consider a candidate named Kimberlee Mulherin for an Interactive Project Manager position.

90.    Rehn worked on the NORC account at Instant. In July of 2012, while employed at Connect Search, Rehn submitted multiple candidates for an open Quality Assurance position at NORC. Rehn also submitted candidates for other open positions at NORC, including Programmer, Mobile Developer and Java roles.

91.    Rehn worked on the Pactiv account while employed at Instant. Rehn submitted at least one candidate for an open position at Pactiv on behalf of Connect Search.

92.    Bauer sourced positions at Sears while employed at Instant. Bauer has sourced positions at Sears on behalf of Connect Search.

93.    In April of 2012, Rehn submitted a candidate for an open position at Shop Local.

94.    Marker placed candidates at Videojet while she was employed at Instant. Marker submitted candidates to Videojet on behalf of Connect Search.

95.    Meek sourced candidates for West Monroe Partners when she worked at Instant. Meek sourced candidates for "a handful" of positions at West Monroe Partners on behalf of

Connect Search.

96.     Marker placed candidates at ZS Associates when she worked at Instant. Marker submitted candidates for two open positions at ZS Associates on behalf of Connect Search.

97.     On May 14, 2012, Rehn sent an email to Joanne King at Accenture. In the email, Rehn notes Connect Search's "25+ years of professional recruiting and staffing experience" and asks about the process for "becoming an approve [sic] staffing vendor for Accenture." Rehn goes on to tell Ms. King that Connect Search "would welcome the opportunity to prove our value to you."

98.     In the spring of 2012, Rehn sent multiple emails to William Boroski at Fermi, attempting to schedule a time to meet. In one such email, Rehn stated she would love to tell Boroski more about the "new company" she founded with "5 other colleagues."

99.     Marker worked on the Tribune account at Instant. On April 26, 2012, Marker emailed Joe Adamo at Tribune and asked if there was any way Connect Search could help "fill [] open roles with [its] candidates."

100.    Rehn placed candidates at United Airlines while employed at Instant. On May 11, 2012, Rehn sent an email to Dwight Nielsen at United Airlines, saying: "I would love the opportunity for Elizabeth [DeFazio] and myself to sit down with you to tell you more about our firm [Connect Search] and the best way to partner with United."

(Dkt. No. 266-1 ¶¶ 1-100.)

## II.     Further Factual Findings

The court's further findings of fact as set forth below are made based on the evidence presented by the parties at the bench trial.[3]

### A.  Instant's Business

Most business entities in the twenty-first century maintain record keeping systems that are computerized. Consequently, most businesses employ an IT staff for day-to-day operations as well as employees with IT skills for special projects, such as implementing a new database architecture or an enterprise resource planning ("ERP") system. Instant's clients reflect the widespread demand for employees with IT skills and have included a major airline, a large metropolitan university, an investment bank, and a local news bulletin.

Instant's products, like other businesses in the IT staffing industry, are the people with IT skills it can identify and convince to become job candidates. Instant makes money when a client, which is a company with IT staffing needs, hires a job candidate put forth by Instant as an employee. In exchange for Instant's successful search, the client pays Instant a commission, typically based on the employee's starting salary. No newly hired employee or job candidate pays Instant anything.

Although Instant enters into a Master Services Agreement ("MSA") with most of its clients, an MSA does not guarantee Instant will earn revenue from any particular client. Clients

---

[3]  Because the parties requested non-certified, real-time transcription of the proceedings during the trial and because a certified transcript of the trial proceedings has not been requested or prepared as of the date of this opinion's issuance, the court cannot include trial transcript citations in this opinion.

want to fill their IT needs as soon as possible and consequently solicit candidates through multiple IT staffing firms and through a number of different online job boards. According to a consulting presentation prepared for Instant in 2011, mid-market clients rely on four to five different IT staffing firms. (JTX 10 at 16.) Large clients, by contrast, use a network of more than ten different vendors. (*Id.*) The fierce competition for clients' open jobs is not an industry secret. CME Group, for example, conducts a regular conference call with its network of IT vendors to discuss current and future staffing needs. Another client, University of Chicago, announces open IT jobs in a single email to 20 or 30 recipients; the recipients, which are all IT staffing firm representatives, see their competition in the "To" line of each email. Clients do not even limit themselves to IT staffing firms. Almost every client—big and small—posts available IT positions to the more popular job boards, including: Dice, which specializes in high tech jobs; Monster; CareerBuilder; and LinkedIn, the social media platform for professional networking.

The result is an IT professional staffing market replete with robust competition. Instant does not have an exclusive relationship with any client, nor does any client guarantee Instant a certain level of business. Although some clients regularly include Instant in their network of "preferred" IT staffing firms, mere inclusion does not translate to a high rate of compensated placements. For every ten job openings where a client invites Instant to compete, Instant places a candidate (and bills the client) only once.

Instant and its competitors also provide the same product, IT candidates. According to Borre, the IT staffing industry is a "very commoditized business." (DTX 10.)[4] Neither Instant

_____

[4] Borre's trial testimony was to the contrary. The court credits Borre's videotaped remarks in

nor its competitors enjoy a reputation for providing higher quality candidates than the rest of the IT staffing industry, partially because the staffing firms market and provide the same candidates. Like clients, candidates have little incentive to limit themselves to a single staffing firm. Instead, like clients, candidates use multiple staffing firms—as well as online job boards—to maximize their opportunities to find a job. The hiring manager for a client may see the same candidate presented by a number of staffing firms and, according to Borre, ultimately buys "from people [he or she] likes." (DTX 10.) Because Instant and its competitors are providing, at any point in time, the same or similar available candidates to an easily identifiable client base, Instant relies heavily on its sales force to drive its business.

## B. Instant's Workforce

As stipulated, Instant divides its workforce into two segments: sales and recruiting. The sales team is in charge of identifying clients, which are companies seeking IT professionals to fill temporary, permanent, or temporary-to-permanent positions. Instant's sales people find prospective clients by performing internet research, cold-calling hiring managers, searching online job boards, such as Monster.com and CareerBuilder.com, and searching social networking sites like LinkedIn. Because Instant's clients' chief goal is to hire qualified candidates, clients readily volunteer information about available jobs. As discussed earlier, sophisticated clients advertise job openings on conference calls or emails with a network of competing IT staffing firms, and all clients—large and small—advertise open jobs on public jobs boards.

---

DTX 10 and discredits her trial testimony because during her trial testimony, Borre had several incentives to prevaricate and her demeanor on the stand evinced that she was not always forthcoming with the truth, despite being under oath.

Instant's recruiters are in charge of finding Instant's product, job seekers with IT skills, referred to by Instant as candidates. Instant's recruiters find candidates in much the same way Instant's sales people find clients: scouring online job boards such as Dice, Monster.com, CareerBuilder.com, personal networking through social networking sites like LinkedIn, and, on occasion, within Instant's own database of past candidates. Once an Instant recruiter locates a candidate, the recruiter often conducts a telephonic or Skype interview with the candidate to gather further information about the candidate's specific IT skills, preferred location, preferred salary, and past experience.

Like many businesses reliant on direct sales, Instant's business thrives on volume. The more points of contact with clients and candidates, the higher rate of billable placements. Instant's 2010 Employee Handbook advises new hires that "[the] job is not difficult," and that "[s]tarting out in this business is a numbers game." (JTX 8 at 0002123.) In order to achieve success, Instant stresses that sales people and recruiters "MUST be on the phone connecting with people to make things happen." (*Id.*) Given the nature of the work, direct sales businesses typically experience high rates of workforce turnover. Instant is no different. Instant lost 13 employees in 2009, 21 employees in 2010, 19 employees in 2011, and 9 employees during the first quarter of 2012. (DTX 9.) At any given time, Instant has between 25 and 40 employees. Since March 26, 2012, 77% of the 26 people employed by Instant on that date have left the firm. (*Id.*) Because neither sales nor recruiting require a high degree of technical skill beyond interpersonal skills and a strong work ethic, sales people and recruiters are replaceable. Each year, despite the turnover, Instant fills its ranks with new recruiters and sales people without significant disruption to its business.

## C. Instant's Business Data

Like every other IT staffing firm, Instant uses a database to aggregate information about its clients and candidates. Instant licenses a database product called SmartSearch, which is popular among recruiting and staffing firms. At the trial, Instant did not present an extract of its SmartSearch database or even a list of the populated fields. The Employee Defendants testified that SmartSearch typically contains the name of a client, contact information for a client's hiring manager, and certain information about a client's open IT positions. On the candidate side, SmartSearch typically contains past and prospective candidates' names and contact information, location preferences, IT skills, employment status, and occasionally some notes about recruiters' personal interactions candidates.

Instant's employees access Instant's network with a username and password unique to each employee. Once an employee is on Instant's network, however, he or she has free access to SmartSearch. Because Instant's sales people and recruiters need to access SmartSearch regularly throughout the day, any additional security measures would be inconvenient.

Instant also uses the information contained in SmartSearch to generate two key reports: a hotlist and a roll-off list.

## D. Instant's Candidate Hotlist

Instant's hotlist or "hot candidate list" is a list of candidates who are ready to work or will be ready to work within 30 days. The hotlist also includes candidates who are not actively looking for a job but would entertain the "right" opportunity; these candidates are listed as "passive public" job seekers on the hotlist. (JTX 8 0002130.) The hotlist typically takes the form of a spreadsheet generated from the data stored in SmartSearch. Unlike SmartSearch, however,

Instant presented a sample hotlist from August 2010 at the trial. (PTX 78.) The hotlist, as of August 2010, contained the following fields: 'Name', 'Skill Set', 'Contract, C2H, Perm.', 'Salary', 'Visa Status', 'Location', 'Date Available', 'Recruiter Name', 'Met in House Y/N', 'Date Entered', and 'Notes'. (*Id.*) The 'Notes' field in the August 2010 hotlist included short recruiter comments like "awesome personality," "10+ years of Java," "proven entity," and "trader stud." (*Id.*) Because the hotlist reflects candidates seeking jobs immediately or in the near future, a hotlist that is more than one or two months old is not useful for recruiters or sales people. Many of the candidates on an outdated hotlist have already found jobs or, if they have not, may not be attractive candidates.

### E. Instant's Candidate Roll-Off List

Instant's roll-off list is similar to the hotlist but pertains to temporary, or contract, workers. The roll-off list is a list of candidates previously placed by Instant in temporary positions. The list is generated from SmartSearch and contains the same fields as the hotlist. The roll-off list also includes the dates on which candidates' temporary assignments end, which is presumably when the candidates will need another contract job. Although Instant cannot always predict with certainty when a candidate's temporary assignment will end, having some estimate gives Instant a head start on competing IT staffing firms in search of skilled candidates.

The roll-off list, like the hotlist, becomes stale after one or two months. A candidate "rolling off" a temporary assignment does not remain available for long; in order to maximize their earning potential, candidates must minimize the time between jobs.

### F. Instant's Employees' Data Practices

With the exception of DeFazio, Instant did not typically provide its employees with laptops during the relevant time period. Consequently, in order to work from home, many employees—including the Employee Defendants—transferred copies of the active hotlist and roll-off list to USB thumb drives or emailed copies of the documents to themselves. Instant encouraged working from home on the nights and weekends, (JTX 8 0002124), and had no policy prohibiting employees from using portable media to facilitate working remotely.

### G. Events of 2011 and 2012

DeFazio joined Instant in 2003 and, for the majority of her tenure, was in charge of training and managing Instant's sales team. DeFazio's last title at Instant was Executive Vice President, Sales & Operations. In 2010, DeFazio and Borre agreed upon a phantom stock ownership plan, whereby DeFazio would receive five percent of cash proceeds if Borre sold Instant. (JTX 5; PTX 172 Ex. A.) DeFazio did not receive voting rights, a seat on Instant's board of directors, or any right to dividends. As stipulated by the parties, "Instant is [and was] wholly-owned by Borre." (Dkt. No. 266-1 ¶ 24.)

In February 2011, Instant hired Ms. Mirjana Schultz ("Schultz") as Instant's Chief Financial Officer. As 2011 progressed, Borre and Schultz decided to change Instant's operations and transition DeFazio's management duties to Schultz. In August 2011, because Instant was not on target to meet its revenue goals, Borre told DeFazio that she should focus on generating sales rather than managing the team. Although DeFazio agreed to spend more time on sales, she was not happy with the change. She enjoyed managing a team more than direct sales. In October 2011, DeFazio told Borre that she wanted to continue training and managing Instant's sales team.

Borre refused and expressly told DeFazio in no uncertain terms that "she [was] no longer responsible for any operations of the firm." (JTX 2.)

On October 26, 2011, after she had been stripped of her management responsibilities, DeFazio received a LinkedIn message from Andrea Katz. DeFazio knew Andrea Katz from her time at Saffire, another IT staffing firm. Andrea Katz and her husband Joel Katz had years earlier founded Addison Search, another staffing firm, which they ultimately sold to a private equity firm. After they sold and left Addison Search, the Katzes started Brown Lab as an investment vehicle to re-enter the search business in Chicago. DeFazio had lunch with Andrea Katz in late October 2011 and met with Joel Katz for breakfast and lunch in November 2011. The Katzes told DeFazio that they planned to start a new IT staffing firm in Chicago and, if DeFazio were interested in leaving Instant, she would be a candidate to run the firm. By mid-December 2011, DeFazio had decided to leave Instant for the Katzes' new firm. Although Katz testified that he was still considering other candidates to run the new firm in late December, he and DeFazio toured potential office space together on December 14, 2011 and were in the final stages of negotiating DeFazio's Connect contract by the end of the month.

At the same time, Bethany Meek, who was working for Instant as a recruiter in St. Louis, Missouri, was looking for a new job in the Chicago area. In December 2011, DeFazio put Meek in touch with the Katzes to discuss the new staffing firm. On December 29, 2011, Meek met with Joel Katz to discuss a position with the new firm. The same day, DeFazio sent Joel Katz an email discussing the details of her future compensation package at the new firm and stating "[I] hope we can also get the ladies on board w us, so [I] do not have to leave them behind." (PTX 150.) As stipulated, Rehn and Marker contacted Joel Katz to discuss his new venture between

December 29, 2011 and December 30, 2011.

On January 1, 2012, as DeFazio and Aoun were preparing for a trip to Panama, Aoun accessed DeFazio's laptop. Aoun synchronized DeFazio's music with her phone and created a backup of her Microsoft Outlook email box, which he testified he had done every few months in the past. The backup of DeFazio's email was stored on the hard drive of her laptop as a .pst file, which is Outlook's default storage format.

On January 3, 2012, Borre terminated DeFazio's employment with Instant for, among other reasons, "undermining" Borre and Instant. Borre spoke with Bauer the same day and after it became clear to Borre that Bauer was "not on board," Borre terminated Bauer as well. One day later, Borre spoke with Rehn about Instant's future and DeFazio's and Bauer's terminations. Borre determined from Rehn's "attitude and smugness" that Rehn "didn't want to have any part of the company." Borre terminated Rehn the next day. On January 5, 2012, following Borre's termination of three employees in three days, Marker resigned her employment with Instant. On January 6, 2012, Meek resigned as well. All of the Employee Defendants joined Connect after their termination or resignation from Instant.

### H. Instant's Investigation after Employee Defendants' Terminations and Resignations

Rebecca Rouhoff is an administrative assistant at Instant who is in charge of closing the user accounts of former employees. When an employee leaves Instant, it is and has been Rouhoff's responsibility to terminate the employee's network password and company credit cards. It is also Rouhoff's procedure to look through the former employee's email and calendar to ensure Instant does not miss any appointments with clients or candidates. On January 3, 2012, after Borre terminated DeFazio, Rouhoff looked through DeFazio's email and did not notice

anything missing. During the second week of January 2012, after Borre instructed Rouhoff to look through DeFazio's email again for signs of misconduct, Rouhoff noticed that a large number of emails had been deleted from DeFazio's inbox. Although some of the emails remained in the Trash folder, some did not.

Rouhoff also testified that upon her post-resignation review of Meek's email, she discovered that Meek had deleted all of the emails in her inbox. Rouhoff discovered this because all of the emails appeared in the Trash folder of Meek's local copy of Outlook and remained accessible.

On January 10, 2012, Instant retained Wilke to conduct a forensic examination of the Employee Defendants' computers. Instant instructed Wilke to search for user activity between December 15, 2011 and January 2, 2012. Wilke picked up the Employee Defendants' computers from Instant on January 10, 2012, imaged the computers' hard drives, and returned the computers to Instant shortly thereafter. Wilke testified that based on his examination of DeFazio's computer, it had not been "booted," *i.e.*, turned on, since January 3, 2012.[5]

Wilke testified that his examination of DeFazio's computer revealed that someone using DeFazio's computer downloaded WinRAR, a compression software, on January 1, 2012. Wilke testified that a two files—12-12.pst and 12-12.RAR—existed on DeFazio's hard drive at some

---

[5]   Based on Wilke's testimony that his examination of DeFazio's computer revealed it had not been booted between January 3, 2012 and January 10, 2012, the court discredits Rouhoff's testimony. Rouhoff testified at the trial that she examined DeFazio's computer, the second time, sometime between January 3, 2012 and January 10, 2012. Rouhoff's alleged examinations would have required her to "boot" DeFazio's computer on two separate occasions between January 3 and January 10, which Wilke's examination showed did not occur.

point between December 15, 2011 and January 10, 2012, but were no longer present on DeFazio's hard drive. Finally, Wilke testified that someone using DeFazio's computer between December 15, 2011 and January 10, 2012 accessed several spreadsheets stored on a thumb drive.

Wilke performed a similar examination of Rehn's computer. Wilke testified that on December 29, 2011 at approximately 10:00 a.m., someone plugged a thumb drive into Rehn's computer and accessed several files stored on the thumb drive. The files stored on the thumb drive included several spreadsheets, one of which was named Hot Candidates August 2010. Wilke also testified that someone using Rehn's computer accessed files on Instant's servers on December 29, 2011. Wilke's analysis did not reveal any evidence that files were transferred to the thumb drive from Instant's servers or Rehn's computer.

Wilke's examination of Marker's computer revealed that someone using Marker's computer accessed a thumb drive on December 29, 2011. The thumb drive contained a number of documents, including the following: Candidates.xls, Potential Clients (email), Bob Padilla (email), Wall Street Journal (email), B-I Overview for Instant.pdf, Trading Companies.xls, Career Search-Instant Technology.xls, Future Roll-Offs as of 3-17-11 for Distribution.xls, and Sales Leads March 2011.xls. Wilke could not ascertain the contents of any of the documents, merely the document names. Wilke found no evidence that any of the files had been transferred from Marker's computer to the thumb drive.

Instant did not ask Wilke to determine whether Instant still had access to the documents stored on the thumb drives, nor did Instant grant Wilke access to its servers to search for copies of the documents stored on the thumb drives.

## I. Startup of Connect

As stipulated, Connect was formed on January 4, 2012. On January 23, 2012, Instant filed this lawsuit against the Defendants. After the lawsuit commenced, the Defendants returned all of Instant's electronic and hard copy documents still in their possession. On February 27, 2012, Connect began operating as an IT staffing firm.

At the time Connect started operating, its database containing client and candidate information, which is similar to SmartSearch, was empty. Since that time, Connect has successfully placed job-seeking candidates at a number of current and former Instant clients, including the University of Chicago, CME Group, and Orbitz.

## III. Applications of Fact and Conclusions of Law

### A. Employee Defendants' Alleged Breach of Employment Agreements (Count I)

Instant asserted that each Employee Defendant breached the Non-Solicitation Covenant, Non-Recruitment Covenant, and Non-Disclosure Covenant (collectively, the "Restrictive Covenants") contained in her Employment Agreement. Instant argued each Employee Defendant violated her Non-Solicitation Covenant and Non-Recruitment Covenant by contacting Instant's clients, candidates, and employees in an effort to transfer Instant's clients, candidates, and employees to Connect. Instant further contended that each Employee Defendant breached her Non-Disclosure Covenant by misappropriating Instant's proprietary information. At the trial, the Employee Defendants did not dispute that, while operating as and for Connect, they contacted Instant's former clients, candidates, and employees in violation of the Non-Solicitation and Non-Recruitment Covenants; the Employee Defendants argued instead that both covenants are unreasonable based on the facts and circumstances in this case. By contrast, the Employee

Defendants argued they did not breach their Non-Disclosure Covenants because they returned all of Instant's information and did not disclose anything confidential. As set forth below, the court agrees. Although the Employee Defendants breached the Non-Solicitation and Non-Recruitment Covenants, those covenants are unreasonable and unenforceable. The court further finds that Instant failed to prove the Employee Defendants violated their Non-Disclosure Covenants.

### i.    Inadequate Consideration for Restrictive Covenants

Before trial, Defendants argued the Restrictive Covenants are not enforceable against Rehn, Marker, and Bauer because the restrictive covenants lack adequate consideration. Rehn, Marker, and Bauer were all employed by Instant for less than two years and received only their employment in exchange for their agreement to the Restrictive Covenants. Instant terminated Bauer on January 3, 2012 and Rehn on January 5, 2012. Marker resigned on January 5, 2012.

In Illinois, before determining whether a restrictive covenant is reasonable, a court must determine: (i) whether the covenant is ancillary to a valid contract; and (ii) whether the covenant is supported by adequate consideration. *Fifield* v. *Premier Dealer Services, Inc.*, 993 N.E.2d 938, 942 (Ill. App. Ct. 1st Dist. 2013) (citing *Lawrence & Allen, Inc.* v. *Cambridge Human Res. Grp., Inc.*, 685 N.E.2d 434, 440 (Ill. App. Ct. 2d Dist. 1997)). The traditional rule regarding contractual consideration is that a court need not inquire into the adequacy of the consideration to support a promise, merely that consideration existed. *Curtis 1000, Inc.* v. *Suess*, 24 F.3d 941, 945 (7th Cir. 1994). Illinois courts, however, do not follow this traditional rule when analyzing restrictive employment covenants because the consideration—new or continued employment—may be illusory when the employment is at will, meaning the employee can be fired at any time. *Id.* at 945-46. In other words, the consideration is inadequate if the employee's

employment can be terminated the minute after the employee agrees to the restrictive covenant. Accordingly, in Illinois, a restrictive covenant is supported by adequate consideration only if, after signing the covenant, an employee remains employed "for a substantial period of time beyond the threat of discharge." *Brown & Brown, Inc.* v. *Mudron*, 887 N.E.2d 437, 440 (Ill. App. Ct. 3d Dist. 2008) (internal citations omitted).

This court has reviewed and considered the *Montel Aetnastak, Inc.* v. *Miessen*, No. 13 C 3801, 2014 WL 702322 (N.D. Ill. Jan. 28, 2014) opinion by Chief Judge Castillo, for whom this court holds great respect. This court, however, predicts the Illinois Supreme Court upon addressing the issue would not alter the doctrine established by the recent Illinois appellate opinions, which clearly define a "substantial period" as two years or more of continued employment. *See Fifield*, 993 N.E.2d at 943 ("Illinois courts have repeatedly held that there must be at least two years or more of continued employment to constitute adequate consideration in support of a restrictive covenant."); *see also Diederich Insurance Agency, LLC* v. *Smith*, 952 N.E.2d 165, 169 (Ill. App. Ct. 5th Dist. 2011) (two years); *Lawrence & Allen*, 685 N.E.2d at 434 (two years); *Brown & Brown*, 887 N.E.2d at 440 (two years).

In *Fifield*, the Illinois Appellate Court for the First Judicial District affirmed the 2013 determination of then Cook County Circuit Judge, and now Illinois Appellate Justice, Mary Ann Mason. Citing several Illinois appellate opinions, the *Fifield* court reaffirmed the holdings in the recent Illinois appellate cases that the "substantial period of time" for an individual's employment required to support adequate consideration is two years or more. The Illinois Appellate Court in *Fifield* further held that the two-year requirement applies equally to factual situations where the restrictive covenant is part of a new employment offer and to those where an employer amends an existing employment relationship. *Fifield*, 993 N.E.2d at 943; *see also*

*Curtis 1000*, 24 F.3d at 947 (rejecting distinction between pre- and post-hire covenants). At least two circuit courts in Cook County, Illinois have acknowledged and applied the bright line two-year rule reaffirmed in *Fifield*. *See Vapor 4 Life, Inc.* v. *Nicks*, No. 13 CH 14827, 2013 WL 6631082, *1 (Ill. Cir. Ct. Dec. 3, 2013); *Klein Tools, Inc.* v. *Stanley Black & Decker, Inc.*, No. 13 CH 13975, 2013 WL 6149305, *2 (Ill. Cir. Ct. Oct. 10, 2013).

Bauer, Marker, and Rehn were all employed by Instant for less than two years. At the trial, Instant did not prove—or even argue—that Bauer, Marker, and Rehn received any additional compensation (other than their employment) in exchange for the Restrictive Covenants. Consequently, under Illinois law, the Restrictive Covenants are not enforceable against Bauer, Marker, or Rehn.

DeFazio and Meek, by contrast, were each employed by Instant for more than two years. Accordingly, the court need not inquire into the adequacy of consideration before assessing whether the Restrictive Covenants are enforceable against DeFazio and Meek.

## ii. Non-Solicitation Covenants in Employee Defendants' Agreements with Instant

### a. *Non-Solicitation of Instant's Candidates*

Instant claims that its Non-Solicitation Covenants prohibit former employees from soliciting (i) the candidates Instant has placed, or attempted to place with a client, and (ii) any client employer where Instant has placed a candidate or with whom Instant has a signed MSA. The plain language of each Non-Solicitation Covenants, however, only limits solicitation of "Instant's Serviced Clients." The Employment Agreement defines "Instant's Serviced Clients" as "any of Instant's Clients who have been serviced by Instant within three (3) years prior to the termination of Employee's employment with Instant . . . ." (Employment Agreements at § 8.) At the trial, Borre stated that "Instant's Serviced Clients" include any client employer Instant has

"billed or executed work for within the past three years," as well as any client employer with whom Instant has "a signed MSA." Borre also testified that Instant does not bill its job-seeking candidates, only its client employers. Instant's 2010 Employee Handbook described a "client" as "[a] company which has asked Instant Technology to locate personnel," (JTX 8 at 0002132), and a "job seeker" as "[a] candidate looking to better their employment opportunities," (JTX 8 at 0002129). Accordingly, Instant presented no evidence at trial that Instant's definition of clients, let alone "Instant's Serviced Clients," includes job-seeking candidates. Because each Non-Solicitation Covenant only limits solicitation of "Instant's Serviced Clients," the court finds that none of the Non-Solicitation Covenants prohibit the solicitation of any *candidates*, whether previously placed with an employer by Instant or not.

### b. *Non-Solicitation of Instant's Clients*

By contrast, the plain language of Instant's Non-Solicitation Covenants expressly bars the solicitation of Instant's clients, which are defined by Instant as companies that have "asked Instant Technology to locate personnel." (JTX 8 at 0002132.) But the court's analysis does not, and under the law should not, end with the language of Instant's Non-Solicitation Covenants. In Illinois, a restrictive covenant is enforceable only if it is reasonable based on the facts and circumstances of the individual case. *Reliable Fire Equip. Co.* v. *Arredondo*, 965 N.E.2d 393, 402 (Ill. 2011). The Illinois Supreme Court has made it clear that courts considering the question should evaluate the reasonableness of such restrictive covenants under a "three dimensional rule of reason" holding that a covenant is reasonable only if it "(1) is no greater than is required for the protection of a legitimate business interest of the employer-promisee; (2) does not impose undue hardship on the employee-promisor, and (3) is not injurious to the public." *Reliable Fire*, 965 N.E.2d at 396 (internal citations omitted). Post-employment restraints like Instant's

Non-Solicitation Covenants are "usually justified on the ground that the employer has a legitimate business interest in restraining the employee from appropriating the employer's (1) confidential trade information, or (2) customer relationships." *Id.* at 401. The existence of a legitimate business interest turns on the totality of the circumstances of each case. Factors the court may consider include, but are not limited to, "the near-permanence of customer relationships, the employee's acquisition of confidential information through his employment, and time and place restrictions." *Id.* at 403.

Generally, near-permanency of customer relationships "turns in large degree on the nature of the business involved, and certain businesses are just more amenable to success under it." *Lawrence & Allen, Inc.*, 685 N.E.2d at 444 (citing *Office Mates 5, North Shore* v. *Hazen*, 599 N.E.2d 1072, 1082 (Ill. App. Ct. 1st Dist. 1992)). "[A] near-permanent relationship is generally absent where the nature of the plaintiff's business does not engender customer loyalty by providing a unique product or personal service and customers utilize many suppliers simultaneously to meet their needs." *Id.* at 444.

Based on the evidence presented at trial, Instant does not enjoy a near-permanent relationship with any of its clients. The IT staffing market is highly competitive. By nature and practice it is non-exclusive. Instant's own business documents reflect the fact that the companies Instant considers its clients typically use between five and ten different staffing firms simultaneously to fill their employment needs. (JTX 10 at 16.) Borre, in her candid recorded remarks, (DTX 10), acknowledged the staffing business is a "commoditized industry," based on sales, where clients ultimately use "people they like" to satisfy their staffing needs. (*Id.*) Although certain clients sign an MSA, an MSA merely qualifies a staffing company as a vendor with that client. An MSA does not guarantee that any IT staffing provider, such as Instant, will

receive any business from that company, let alone enjoy a "near permanent" client relationship with that company in connection with its IT staffing needs.

### c. Instant's Purported Confidential Information

Instant alleged that information related to its clients—such as the names of its clients, Instant's contact people at its clients, the services purchased by its clients, and the prices charged by Instant—constitutes confidential information that is not known or easily ascertainable by the general public. The evidence presented at trial, however, did not support Instant's position. The names of Instant's clients and the "services purchased," *i.e.*, the clients' IT hiring needs, are simply not confidential. To the extent that job openings or hiring needs are not publicly posted elsewhere, the information is readily attainable using Instant's traditional method: cold-calling and cold-emailing. Instant had no contractual arrangements with its clients that required Instant's clients to keep any such information, or information about Instant's candidates, confidential. No client would agree to such an arrangement because it would be inconsistent with the non-exclusive, competitive nature and practice in the industry, and would not be in any client's best interests.

Instant's information about job-seeking candidates is similarly not confidential. Candidates post their qualifications publicly on sites like LinkedIn, inform a number of different staffing firms that they are seeking employment, and provide each of those staffing firms with all of the information contained in Instant's SmartSearch database. Although certain information contained in the 'Notes' field of Instant's hotlist and roll-off list—such as the observation that a candidate has an "awesome personality" or is a "trader stud"—is not likely to appear on a resume or LinkedIn, other staffing firms harvest personality information the same way Instant does: by cold-calling the candidates.

Even if Instant's clients' hiring needs, candidates' credentials, or candidates' availability had been confidential at any point in time, and the court finds they were not, the information available during the Employee Defendants' employment with Instant is no longer useful. Clients' hiring needs and the pool of available applicants are far from static; they change constantly as clients fill open positions and job-seeking candidates find jobs. Thus, the information that was available to the Employee Defendants during their employment with Instant is now, two years later, out of date.

In light of the foregoing facts and circumstances, the court finds that Instant failed to prove by a preponderance of the evidence that Instant's Non-Solicitation Covenants with the Employee Defendants were not greater than required to protect Instant's legitimate business interests. Instant did not prove a "near-permanent" relationship between Instant and its clients, nor did Instant prove that the Employee Defendants gained access to non-public, confidential information during the course of their employment. Consequently, the court finds the restrictive Non-Solicitation Covenants are invalid and unenforceable.

This court's findings are consistent with past determinations by the Illinois appellate courts concerning restrictive covenants in the staffing industry. *See, e.g.*, *Lawrence & Allen, Inc*, 685 N.E.2d at 444 (holding covenants unenforceable because "the [staffing] industry is highly competitive, the identity of customers or clients is well known in the industry, employers rely heavily on their sales force, and customers satisfy their needs through cross-purchasing"); *Office Mates 5, North Shore*, 599 N.E.2d at 1082 (restrictive covenants are unenforceable when staffing firms "utilize basic sales techniques such as cold calls to make sales" and "[t]he identity of customers or clients are known by all in the industry").

### iii. Non-Recruitment Covenants in Employee Defendants' Agreements with Instant

The language of Instant's Non-Recruitment Covenants prohibits current or former Instant employees from persuading any employee to leave Instant's employ or breach their Employment Agreement with Instant. *See* Employment Agreements § 8(e). Instant contends that it needs the Non-Recruitment Covenants to maintain stability within its workforce, and that the covenants are reasonably tailored for that purpose.

In certain circumstances, maintaining stability within an employer's workforce can be a legitimate business interest and thus the basis for a restrictive covenant. *See Pampered Chef* v. *Alexanian*, 804 F. Supp. 2d 765, 781-86 (N.D. Ill. 2011) (Cole, M.J.); *see also YCA, LLC* v. *Berry*, No. 03 C 3116, 2004 WL 1093385, *17-19 (N.D. Ill. May 7, 2004) (Leinenweber, J.) (holding non-recruitment clauses should be upheld only to the extent they prevent former employees from recruiting competitors' employees who possess confidential business information). But like any restrictive covenant, the recruitment restrictions must be no greater than necessary to protect the interests at stake. *Reliable Fire*, 965 N.E.2d at 396. Although the necessity and reasonableness of the restrictions are dictated by the facts and circumstances of an individual case, blanket prohibitions are rarely necessary or reasonable. *Pampered Chef*, 804 F. Supp. 2d at 787 (citing *YCA, LLC*, 2004 WL 1093385, at *17-18). The business interest underlying this covenant must also be real—not merely aspirational. The "maintenance of a stable work force . . . requires a work force that is stable in the first instance or at least one whose stability will likely result from the restrictive covenant." *Id.*

Here, as a result of departures or terminations, Instant lost 13 employees in 2009, 21 employees in 2010, 19 employees in 2011, and 9 employees during the first quarter of 2012 (including the 5 Employee Defendants). Although neither Instant nor Defendants provided the

total number Instant employees in any of those years, Instant currently has about 40 employees. Since March 26, 2012, nearly four months after the Employee Defendants left Instant, 77% of the 26 people employed at Instant on that date have left the firm. Instant's explanation for the substantial employee turnover rate—that it is the result of the Employee Defendants' departures—does not square with Instant's high employee turnover before and after the Employee Defendants' departures. The reality is that Instant's business relies on a high volume of direct sales, which is a business model traditionally characterized by "massive" turnover. *See, e.g.*, *Pampered Chef*, 804 F. Supp. 2d at 788 (summarizing historic turnover in direct sales industries).

Instant's historic turnover rate is inconsistent with a finding that Instant's Non-Recruitment Covenants are necessary to maintain a stable work force. To the contrary, the evidence presented at trial proved that Instant's Non-Recruitment Covenants have been wholly ineffective as a means to maintain workforce continuity. The absence of any other basis to justify such covenants, as well as the absence of any place or time restrictions—the covenants prohibit solicitation of former employees everywhere and in perpetuity—render Instant's Non-Recruitment Covenants unreasonable and unenforceable.

### iv. Non-Disclosure Covenants in Employee Defendants' Agreements with Instant

Instant alleged that the Employee Defendants violated the Non-Disclosure Covenants by disclosing Instant's "proprietary property" to individuals outside of the firm without Instant's consent. The Employment Agreement defines "proprietary property" as:

> information regarding the business, procedures, activities and services of Instant or Instant's Clients, including but not limited to, memoranda; files; programs; clients account and customer lists; information about and notes regarding customers, candidates and consultants and their reserves (placed, active and inactive); costs and prices of Instant; client needs, requirements and business

affairs; records; manuals; computer data and reports ...

(Employment Agreements § 7(a).)

As a threshold matter, Instant did not prove at the trial that any of the Employee Defendants disclosed any of Instant's Proprietary Property to individuals outside of Instant. Instant retained Wilke, a computer forensics expert, to investigate the Employee Defendants' computers after the Employee Defendants had left Instant by termination or resignation. Wilke testified that DeFazio's computer contained evidence that, at some point before her termination, DeFazio created a backup of Instant emails and stored the backup on her laptop. Wilke did not find the backup information when he examined DeFazio's computer after her termination. Wilke also testified that Rehn and Marker, while employed by Instant, accessed certain files stored on thumb drives, which were plugged into their computers. Wilke did not testify regarding what information was contained in these files, nor did Wilke testify that Rehn or Marker disclosed the files stored on the thumb drives after they left Instant. In other words, with regard to Rehn and Marker, Wilke's testimony established one point: Rehn and Marker used a thumb drive to store Instant files during the course of their employment with Instant.

In January 2012, immediately after Instant filed this lawsuit and before Connect began operating on February 27, 2012, the Employee Defendants returned all of Instant's documents and data still in their possession, including any documents on thumb drives. The return of these materials to Instant was consistent with and satisfied the Employee Defendants' obligations under section 7(b) of their respective Employment Agreements. At the trial, Instant did not prove—or even argue—that the Employee Defendants retained any of the Instant documents stored on thumb drives. Instant at trial did not prove that the Employee Defendants used any of Instant's information while operating as Connect. In fact, at the start of operations, Connect's

internal database of clients and candidates was empty. Because Instant failed to prove that the Employee Defendants disclosed or even retained any of Instant's Proprietary Property, the court finds the Employee Defendants did not violate their respective Non-Disclosure Covenants.

**B. Defendants' Alleged Violation of Illinois Trade Secrets Act (Count II)**

Instant claims that Defendants violated the Illinois Trade Secrets Act ("ITSA") by actual or threatened misappropriation of Instant's "Confidential Information." (Am. Compl. ¶ 93.) Instant defines "Confidential Information" as:

> Instant keeps records for each client, candidate and third party supplier, including, among other things, the client's, candidate's and supplier's addresses and telephone numbers, the names of the client and supplier contacts, the candidate's resume, and other information unique to the client, candidate and third party supplier. All of this information is not known by third parties outside of Instant and cannot be compiled and organized through public sources. Accordingly, this information is proprietary and confidential to Instant (the "Confidential Information").

(Am. Compl. ¶ 24.)

Under Illinois law, a party pursuing an action under the ITSA must prove that it possessed and preserved trade secrets and that the defendant misappropriated those secrets, as defined by the provisions of the ITSA. *See, e.g., Applied Indus. Materials Corp.* v. *Brantjes*, 891 F. Supp. 432, 437 (N.D. Ill. 1994) (Holderman, J.). The ITSA defines a trade secret as information that is not "generally known to other persons." 765 ILCS 2(d)(1). Moreover, "it is not enough to point to broad areas of technology and assert that something there must have been secret and misappropriated. The plaintiff must show concrete secrets." *Composite Marine Propellers, Inc.* v. *Van Der Woude*, 962 F.2d 1263, 1266 (7th Cir. 1992).

The second prong of the ITSA, misappropriation, occurs by improper acquisition, unauthorized disclosure, or unauthorized use. 765 ILCS 1065/2(b); *Lumenate Techs., LP* v. *Integrated Data Storage, LLC*, No. 13 C 3767, 2013 WL 5974731, *5 (N.D. Ill. Nov. 11, 2013)

(St. Eve, J.) (citations omitted). Misappropriation by improper acquisition requires acquisition by improper means, which the ITSA defines as "theft, bribery, breach of inducement of a breach of a confidential relationship or other duty to maintain secrecy or limit use, or espionage through electronic or other means." 765 ILCS 1065/2(a). Misappropriation by unauthorized disclosure or unauthorized use requires a defendant to use the alleged trade secrets or disclose them to others "for purposes other than serving the interests of" the owner of the trade secrets. *Lumenate Techs.*, 2013 WL 5974731, at *4 (citations omitted).

As discussed above, none of the client or candidate information maintained by Instant is secret. The identity of Instant's clients, the clients' hiring needs, and the qualifications of Instant's candidates are not secrets. Information regarding open positions is often available publicly, is provided to Instant's competitors by Instant's clients, and is provided by Instant to potential candidates Instant would like to place. The identity, qualifications, and availability of Instant's candidates are published on public job boards and known by Instant's competitors, who are often trying to place the same candidates. Under Illinois law, where information is generally known to others who could benefit from using it, the information is not a trade secret. *See, e.g.*, *Mangren Research & Dev. Corp.* v. *National Chem. Co.*, 87 F.3d 937, 943 (7th Cir. 1996). In this case, Instant's clients, candidates, and competitors all have access to the information Instant claims is secret and they can all benefit from the information. Consequently, because Instant failed to prove that any of its purportedly confidential information is actually secret and not readily ascertainable by its competitors or the public at large, it cannot sustain a claim under the ITSA.

Even if Instant's client and candidate information were secret (which the court has found it is not), Instant did not prove that Defendants misappropriated any of its information. Like

many workers, Instant's employees used thumb drives to store and transport documents. At the time, the Employee Defendants were authorized to access the documents stored on the thumb drives. When the Employee Defendants left Instant, through resignation or termination, the Employee Defendants did not immediately return every Instant thumb drive in their possession. Upon Instant's request, however, the Employee Defendants returned all of Instant's thumb drives, data, and documents before Connect opened for business. There was no proof presented at trial of any unauthorized disclosure and, consequently, no misappropriation by the Employee Defendants within the meaning of the ITSA.

## C. DeFazio's and Connect Defendants' Alleged Tortious Interference with Contract (Count III)

Because the court finds the Restrictive Covenants unenforceable, Instant's claim for tortious interference with contract against DeFazio, Joel Katz, Andrea Katz, and Connect also fails. Instant claimed that DeFazio, the Katzes, and Connect wrongfully and unjustifiably interfered with the relationships by causing DeFazio, Rehn, Marker, Meek, and Bauer to: (a) solicit and do business with Instant's clients and candidates on behalf of Connect; and (b) take, disclose and/or misappropriate Instant's confidential information. (Am. Compl. ¶ 99.)

In Illinois, the elements necessary for tortious interference with contract are: "(1) the existence of a valid and enforceable contract between the plaintiff and another; (2) the defendant's awareness of this contractual relation; (3) the defendant's intentional and unjustified inducement of a breach of the contract; (4) a subsequent breach by the other, caused by the defendant's wrongful conduct; and (5) damages." *HPI Health Care Services, Inc.* v. *Mt. Vernon Hospital, Inc.,* 545 N.E.2d 672, 676 (Ill. 1989).

As set forth above, Instant failed to satisfy the threshold element: a valid and enforceable

contract. Since the Restrictive Covenants are not valid or enforceable, they cannot serve as the underlying basis for Instant's tortious interference with contract claim.

### D. Employee Defendants' Alleged Breach of Fiduciary Duty (Count IV)

Instant alleged that the Employee Defendants, while they were employed by Instant, breached their fiduciary duties to Instant, which included

> devoting their full working time and efforts to Instant, refraining from forming and operating Connect Search and competing against Instant, soliciting Instant's clients, candidates, suppliers, and employees on behalf of Connect Search, diverting Instant Technologies corporate opportunities, sabotaging Instant's computer systems, and stealing Instant's Confidential Information and/or obtaining and misusing such Confidential Information.

(Am. Compl. ¶ 104.) Instant also alleged that the Employee Defendants continue to breach their fiduciary duties by unlawfully and unfairly competing with Instant as part of Connect. (*Id.* ¶ 105.)

At the trial, Instant presented evidence that DeFazio, while employed by Instant, met with Joel and Andrea Katz to discuss forming Connect and subsequently toured potential office space for Connect. Instant stipulated, however, that Connect did not commence its business activities until February 27, 2012, nearly two months after all of the Employee Defendants left Instant. (Dkt. No. 266-1 ¶ 58.) Instant did not prove or argue that any of the Employee Defendants solicited Instant's clients or candidates before leaving Instant, nor did Instant prove that the Employee Defendants engaged in any activities in competition with Instant during their employment.

The Employee Defendants were entitled to prepare Connect to do business as long as they did not actually compete with Instant. *See Voss Engineering, Inc.* v. *Voss Industries, Inc.*, 481 N.E.2d 63, 66 (Ill. App. Ct. 1st Dist. 1985) ("[a]n employee may legitimately go so far as to

form a rival corporation and outfit it for business while still employed by the prospective competitor") (citing *Lawter International, Inc.* v. *Carroll*, 451 N.E.2d 1338, 1349 (Ill. 1983)). Although the Employee Defendants were not permitted to exceed "such preliminary competitive activities and commence business as a rival concern while still employed," *id.*, Instant did not prove that the Employee Defendants engaged in any conduct beyond "preliminary activities" or actually competed with Instant during their employment.

Instant dedicated considerable time at the trial to questioning the other Employee Defendants about DeFazio's efforts to recruit them for Connect while she was employed by Instant. Absent the Non-Recruitment Covenants, which this court has found unenforceable, there exists no fiduciary duty precluding DeFazio from soliciting Instant's employees. As a general rule, in Illinois, only a corporate officer can be held liable for soliciting employees for a new venture. *Nicor Energy* v. *Dillon*, No. 03 C 1169, 2003 WL 21698422, *3 (N.D. Ill. July 30, 2003) (Zagel, J.) (citing *Smith-Shrader Co.* v. *Smith*, 483 N.E.2d 283, 288 (Ill. App. Ct. 1st Dist. 1985); *Hagshenas* v. *Gaylord*, 557 N.E.2d 316, 324 (Ill. App. Ct. 2d Dist. 1990)). Instant did not prove that DeFazio was a corporate officer. First, although DeFazio's title was "Executive Vice President of Sales and Operations of Instant Technology," a mere title is not sufficient. In order to be considered an officer, DeFazio must have performed "significant managerial and supervisory responsibilities for the operation of the . . . office." *Id.* (quoting *Aon Risk Services, Inc. of Ill.* v. *Shetzer*, No. 01 C 7813, 2002 WL 1989466, *4 (N.D. Ill. Aug. 27, 2002) (Conlon, J.)). On October 4, 2011, before Andrea Katz contacted DeFazio about a new venture, Borre made clear to DeFazio that she was "no longer responsible for any operations of the firm." (JTX 2.) Second, Instant cannot rely on DeFazio's phantom stock plan—which did not confer an equity interest or voting rights or create a fiduciary duty owed by Borre to DeFazio—to fashion

an inverse fiduciary duty owed by DeFazio to Borre. Accordingly, the court finds that neither DeFazio nor any other Employee Defendant violated any fiduciary duty during the course of their employment by engaging in preliminary activities to outfit Connect or by soliciting Instant's employees to join Connect.

The court also finds that the Employee Defendants did not violate any fiduciary duties after their employment with Instant ended. Under Illinois law, absent a valid post-employment restrictive covenant, "once an employee leaves the service of an employer, he ceases to owe that employer a fiduciary duty and is free to compete with his former employer." *Jostens, Inc.* v. *Kauffman*, 842 F. Supp. 352, 354 (C.D. Ill. 1994) (citing *Prudential Ins. Co.* v. *Sempetrean*, 525 N.E.2d 1016, 1020 (Ill App. Ct. 1st Dist. 1988)). Although the Employment Agreements contain post-employment restrictive covenants, the court has found that they are invalid and unenforceable. Consequently, the Employee Defendants owed no fiduciary duty, and thus breached no duty, to Instant after their employment terms ended.

### E. Employee Defendants' Alleged Violation of the Computer Fraud and Abuse Act (Count V)

Instant claims that the Employee Defendants violated the Computer Fraud and Abuse Act ("CFAA"), 18 U.S.C. § 1030, by accessing Instant's computer systems, damaging Instant's computer systems, misappropriating Instant's confidential information, and deleting data from Instant's computer systems.

To state a claim for a violation of the CFAA, a plaintiff must prove: "(1) damage or loss; (2) caused by; (3) a violation of one of the substantive provisions set forth in § 1030(a); and (4) conduct involving one of the factors in § 1030(c)(4)(A)(i)(I)-(V)." *Cassetica Software, Inc.* v. *Computer Sciences Corp.*, No. 09 C 0003, 2009 WL 1703015, at * 3 (N.D. Ill. June 18, 2009)

(Kendell, J.). The "underlying concern of the [CFAA] is damage to data and … the statute was not meant to cover the disloyal employee who walks off with confidential information." *Del Monte Fresh Produce, N.A., Inc.* v. *Chiquita Brands Int'l*, 616 F. Supp. 2d 805, 813 (N.D. Ill. 2009) (Hibbler, J.) (quoting *Kluber Skahan & Assocs.* v. *Cordogan, Clark & Assocs., Inc.*, No. 08 C 1529, 2009 WL 466812, *8 (N.D. Ill. Feb. 25, 2009) (Zagel, J.)) (internal quotations omitted).

Instant claims the Employee Defendants "damaged" its computer systems. The CFAA defines "damage" as "any impairment to the integrity or availability of data, a program, a system, or information." 18 U.S.C. § 1030(e)(8). Courts in this district have consistently interpreted "damage" under the CFAA to include "the destruction, corruption, or deletion of electronic files, the physical destruction of a hard drive, or any diminution in the completeness or usability of the data on a computer system." *See, e.g., Farmers Ins. Exch.* v. *Auto Club Grp.,* 823 F. Supp. 2d 847, 852 (N.D. Ill. 2011) (Holderman, J.) (collecting cases). By contrast, downloading or emailing information is not enough to satisfy the damage requirement of the CFAA. *Id.*; *see also Motorola* v. *Lemko Corp.,* 609 F. Supp. 2d 760, 769 (N.D. Ill. 2009) (Kennelly, J.) ("The only harm [plaintiff] has alleged is the disclosure to a competitor of its trade secrets and other confidential information. The CFAA's definition of damage does not cover such harm . . . .")

At trial, Instant proved that Bethany Meek's deleted all of the emails in her inbox directly before her resignation from Instant. Instant admitted, however, that it did not lose access to Meek's email. Meek's emails, after she deleted them, remained in two places: (i) her email trash folder and (ii) on Instant's exchange server. Because Instant did not show that any data was lost or impaired, Instant cannot sustain a claim for "damage" under the CFAA.

Although Instant did not allege any "loss" in its Amended Complaint, the court must

consider whether Instant can recover for its purported "damages" under the "loss" provision of the CFAA. The CFAA defines "loss" as "any reasonable cost to any victim, including the cost of responding to an offense, conducting a damage assessment, and restoring the data, program, system, or information to its condition prior to the offense, and any revenue lost, cost incurred, or other consequential damages incurred because of interruption of service." 18 U.S.C. § 1030(e)(11). A split has emerged among courts in this district concerning the proper construction of "loss" under the CFAA. *Compare Farmers Ins. Exch.*, 823 F. Supp. 2d at 854 ("[A] plaintiff can satisfy the CFAA's definition of loss by alleging costs reasonably incurred in responding to an alleged CFAA offense, even if the alleged offense ultimately is found to have caused no damage as defined by the CFAA.") (citations omitted), *with Von Holdt* v. *A-1 Tool Corp.*, 714 F. Supp. 2d 863, 875-76 (N.D. Ill. 2010) (Manning, J.) (requiring "damage to the computer or computer system" before a plaintiff can prove "loss" under the CFAA). Courts in this district consistently agree, however, that "[c]osts not related to computer impairment or computer damages are not compensable under the CFAA." *SBS Worldwide, Inc.* v. *Potts*, No. 13 C 6557, 2014 WL 499001, *9 (N.D. Ill. Feb. 7, 2014) (Holderman, J.) (quoting *Farmer Ins. Exch.*, 823 F. Supp. 2d at 855) (additional citations omitted); *see also Cassetica Software*, 2009 WL 1703015, at *4 ("With respect to 'loss' under the FCAA, other courts have uniformly found that economic costs unrelated to computer systems do not fall within the statutory definition of the term."); *CustomGuide* v. *CareerBuilder, LLC*, 813 F. Supp. 2d 990, 998 (N.D. Ill. 2011) (Holderman, J.) (finding plaintiff failed to state a CFAA claim by failing to allege "any facts connecting its purported 'loss' to an interruption of service of its computer systems").

Instant hired Wilke to conduct an examination of the Employee Defendants' computer "activity" between December 15, 2011 and January 2, 2012. If Instant retained Wilke to

investigate data impairment or loss, the cost of Wilke's services might be compensable as a loss under the CFAA. Instant, however, hired Wilke to assist Instant's counsel in Instant's lawsuit against Defendants. Wilke testified that he was not granted access to Instant's servers, which would have been necessary to determine whether Instant had permanently lost the files stored on the thumb drives the Employee Defendants briefly retained after their employment ended. On these facts, the court finds Instant failed to establish that Wilke's examination was for the purpose of assessing impairment or loss of data.[6]

### F.  Defendants' Alleged Tortious Interference with Business Expectancies (Count VI)

Instant's Amended Complaint alleges Instant "maintained valid business relationships with many clients, candidates and third parties, and had a reasonable expectation that its relationships with those clients, candidates and third party suppliers would continue." (Am. Compl. ¶ 116.) Under Illinois law, to prove a case of tortious interference with a business expectancy, a plaintiff must show: (i) the plaintiff's reasonable expectation of entering into a valid business relationship; (ii) the defendant's knowledge of the plaintiff's expectancy; (iii) purposeful interference by the defendant that causes the plaintiff's expectations to remain unfulfilled; and (iv) that the defendant's interference has resulted in damages to the plaintiff. *Delloma* v. *Consolidation Coal Co.*, 996 F.2d 168, 170–71 (7th Cir.1993). To satisfy the first element of tortious interference, a plaintiff must specifically identify the customers who "actually contemplated entering into a business relationship with [the plaintiff]." *Celex Group, Inc.* v. *Executive Gallery*, 877 F. Supp. 1114, 1126 n.19 (N.D. Ill. 1995) (Castillo, J.). Merely

---

[6]  Instant also did not present evidence relating to Wilke's fee, which would have been important for an estimate of "loss" under the CFAA.

providing proof of a past customer relationship is not sufficient to prove a "reasonable expectation" of a business relationship in the future. *Id.* at 1124.

As the court discussed earlier, the IT staffing industry is highly competitive. The evidence at trial showed Instant's clients used multiple staffing firms, their own company websites, and public job boards to solicit applicants for open positions. Accordingly, the fact that clients used Instant in the past provides no guarantee that they will do so in the future, or that Instant will win the business given the opportunity. As discussed earlier, when a client includes Instant in its network of IT staffing firms, Instant ultimately wins the business only 10 percent of the time. At the trial, Instant presented evidence that Connect has solicited—and in some cases won—business from a number of companies from which Instant has collected fees between 2009 and 2011. Instant did not, however, provide any evidence demonstrating a reasonable expectation of business from any of its clients in the future. Instead, Instant relied solely on proof of past relationships with its clients, which is not sufficient to create a "reasonable expectation" of future business under Illinois law. *Id.* at 1124.

Because Instant failed to prove sufficiently the threshold element of tortious interference with a business expectancy—a reasonable expectation of future business from a specific client—the court finds that Instant failed to prove that any of the Defendants tortuously interfered with a business expectancy.

### G. Defendants' Alleged Civil Conspiracy (Count VII)

Instant's final claim alleged a civil conspiracy among Defendants to use and misappropriate Instant's "Confidential Information, and damage Instant's computer systems." (Am. Compl. ¶¶ 123-24.) In order to prove a claim of civil conspiracy, Instant must show that Defendants had an agreement to accomplish "either an unlawful purpose or a lawful purpose by

unlawful means" and that each of the defendants "knowingly and voluntarily participated in a common scheme to commit an unlawful act or a lawful act in an unlawful manner." *Mosley* v. *City of Chicago,* 614 F.3d 391, 399-400 (7th Cir. 2010). "The function of the conspiracy claim is to extend liability in tort beyond the active wrongdoer to those who have merely planned, assisted, or encouraged the wrongdoer's act." *Adcock* v. *Brakegate, Ltd.*, 645 N.E.2d 888, 894 (Ill. 1994).

Because the court finds that Instant failed to prove any of the torts alleged in its Amended Complaint—misappropriation of trade secrets, interference with contract, or interference with a business expectancy—there is no underlying tort for which Instant may "extend" liability. Thus, like Instant's tort claims, Instant's civil conspiracy claim fails as well.

## H. DeFazio's Counterclaim for Alleged Breach of Agreement and Violation of Illinois Wage Payment and Collection Act

Defendant DeFazio asserted a counterclaim against Instant for breach of agreement and violation of the Illinois Wage Payment and Collection Act, 820 ILCS 115. (Dkt. No. 54.) DeFazio alleged to have earned a bonus for 2011 in the amount of $42,000, which Instant was allegedly obligated to pay DeFazio by December 30, 2011. On December 30, 2011, Instant paid DeFazio only $10,000 and declined to pay the remainder of DeFazio's allegedly earned bonus after her termination on January 3, 2012.

At the trial, DeFazio presented a letter dated December 17, 2010 (the "Compensation Letter") from Borre to DeFazio. (JTX 5.) The Compensation Letter summarizes DeFazio's "proposed 2011 compensation package," and is signed by both Borre and DeFazio. DeFazio alleged that under the terms of the Compensation Letter, she was entitled to a $42,000 bonus for her work in 2011. (*Id.*)

The first section of the Compensation Letter, titled "Sales Goal," outlines a revenue goal and a net income goal for Instant to reach in 2011. Instant's revenue goal was $21.75 million and Instant's net income goal for 2011 was $1.3 million. (*Id.*) Directly under the $1.3 million net income goal, there are three sub-bullets: (1) "Revenue (50%)"; (2) "Net income (35%")"; and (3) "Perm Division must achieve 600K in gross revenue (15%)." (*Id.*) Although the percentages associated with each sub-bullet sum to 100%, it is not clear how the sub-bullets relate to the $1.3 net income goal. At the trial, DeFazio contended that the sub-bullets, notwithstanding their placement under the $1.3 million net income goal, actually reflect the percentage of the total bonus attributable to revenue, net income, and "perm division" gross revenue.

The second section of the Compensation Letter, titled "Salary and Performance Bonus," outlines DeFazio's base salary and quarterly salary bumps contingent upon Instant meeting its quarterly goals for gross revenue, GPM, and net income. (*Id.*) The Compensation Letter defines the quarterly goals for gross revenue, but is silent on GPM and net income. (*Id.*) As one would expect, the gross revenue goal for the fourth quarter is $21.75 million, which is equal to the annual revenue goal stated in the preceding "Sales Goal" section. At the end of the "Salary and Performance Bonus" section, the Compensation Letter provides for an additional performance bonus. The Compensation Letter states: "You are eligible for $120,000 in performance bonus when Instant Technology achieves the above stated company revenue and net income goals. This bonus will be paid on December 30, 2011." (*Id.*)

At the trial, both DeFazio and Borre agreed that the $120,000 bonus, although set out in the "Salary and Performance Bonus" section of the Compensation Letter, was contingent upon Instant meeting the revenue and net income goals outlined in the "Sales Goal" section. In 2011, Instant fell short of its $21.75 million revenue goal, but reached its $1.3 million net income goal.

Accordingly, consistent with the percentages outlined in the "Sales Goal" section, DeFazio argued that she was entitled to 35% of $120,000, or $42,000. Borre testified that the bonus was contingent upon Instant reaching both its revenue and net income goals. As Borre noted at trial, the language of the Compensation Letter states that Instant must achieve the revenue *and* the net income goals, not one or the other. Because Instant did not reach both goals in 2011, Borre declined to pay a performance bonus.[7]

In light of the ambiguity in the Compensation Letter and the lack of clarification at trial, the court cannot determine (a) whether the percentages listed under "2011 net income goal" actually reflect the framework for the $120,000 bonus mentioned in the following section of the letter, or (b) whether the Compensation Letter provides for a partial bonus based on the percentages. DeFazio, who bears the burden of proof, did not present any other evidence at trial to support her claim to the bonus. Consequently, the court finds that DeFazio failed to prove by a preponderance of the evidence that she is entitled to the remainder of her allegedly earned $42,000 bonus.

## IV.   Conclusion

For the reasons stated above, the court determines based on the evidence presented at the April 2014 trial that Instant failed to meet its burden to prove any of the counts alleged in Instant's First Amended Verified Complaint. Instant withdrew its request for injunctive relief. Instant failed to prove the Employee Defendants breached their Employment Agreements with Instant (Count I) or their fiduciary duties to Instant (Count IV). Instant also failed to prove that any of the Defendants violated the Illinois Trade Secrets Act (Count II) or the Computer Fraud

---

[7]    Borre did not explain the basis for the $10,000 bonus Instant actually paid to DeFazio.

and Abuse Act (Count V), or that any of the Defendants committed any common law torts (Counts III and VI) or participated in a civil conspiracy (Count VII). The court also finds that DeFazio is not entitled to the remainder of the 2011 bonus she is seeking, but DeFazio need not return what she was given. The court directs the Clerk to enter judgment in favor of Defendants on all of Instant's claims and in favor of Instant on DeFazio's counterclaim. The court requests the parties to seek to resolve amicably any issues they may have regarding costs or fees. Civil case terminated.

ENTER:

_James F. Holderman_____
JAMES F. HOLDERMAN
District Judge, United States District Court

Date:   May 2, 2014